**In re NTL, INCORPORATED, et al., Debtors.**

**JMB Capital Partners, L.P., Plaintiff,**

v.

**CRT Capital Group LLC, Defendant.**

**Langley Partners, LP, Plaintiff,**

v.

**CRT Capital Group LLC, Knight Securities LP, RTX Securities Corporation, Defendants.**

**Highbridge/Zwirn Capital Management, LLC, Plaintiffs,**

v.

**CRT Capital Group LLC, Maxcor Financial Inc., Defendants.**

**Owl Creek Asset Management, L.P., Plaintiff,**

v.

**CRT Capital Group LLC, Defendant.**

**St. Albans Partners, Ltd., Plaintiff,**

v.

**CRT Capital Group LLC, Defendant.**

**CRT Capital Group LLC, Plaintiff,**

v.

**P. Schoenfeld Asset Management, LLC, et al., Defendants.**

Bankruptcy No. 02–41316 (ALG).
Adversary Nos. 03–8019 (ALG) to 03–8023(ALG), 03–8156(ALG).

United States Bankruptcy Court, S.D. New York.

June 27, 2003.

Kaye Scholer, LLP, by Jay Strum, Michael M. Pomerantz, New York City, for CRT Capital Group LLC.

Kasowitz, Benson, Torres & Friedman LLP, by Joseph A. Gershmon, New York City, for JMB Captial Partners, L.P. & Owl Creek Asset Management, L.P.

Stroock & Stroock & Lavan LLP, by Bruce H. Schneider, Gerald Bender, New York City, for Highbridge/Zwirn Capital Management, LLC.

Lebeouf, Lamb, Greene & Macrae, LLP, by Irena Goldstein, David Bicks, New York City, for P. Schoenfeld Asset Management, LLC.

Skadden, Arps, Slate, Meagher & Flom LLP, by Seth M. Schwartz, Kayalyn A. Marafioti, New York City, for NTL, Inc., et al.

Fried, Frank, Harris, Shriver & Jacobson, by Bonnie Steingart, New York City, for Official Committee of Unsecured Creditors.

Loeb & Loeb, LLP, by P. Gregory Schwed, New York City, for Maxcor Financial Inc.

Morgan, Lewis & Bockius, LLP, by Robert C. Mendelson, New York City, for Maxcor Financial Inc.

The Depository Trust & Clearing Corporation, by Karen L. Saperstein, New York City, for the National Association of Securities Dealers.

The National Association of Securities Dealers, by Terri L. Reicher, Washington, DC.

Kirkpatrick & Lockhart, LLP, by Christine Button, New York City, for St. Albans Partners, Ltd.

Sonnenschein, Nath & Rosenthal, by David Parker, New York City, for Langley Partners, LP.

Butler, Fitzgerald & Potter, PC, by Andrew Sidman, New York City, for Knight Securities LP.

Paul, Weiss, Rifkind, Wharton & Garrison, by Duane Meyers, New York City, for AIG DKR Southshore Investors.

Gibson, Dunn & Crutcher, LLP, by Mitchell A. Karlan, M. Natasha Labovitz, New York City, for Halcyon/Alan B. Slifka Management Company LLC, Halcyon Management Company LLC, and Halcyon Offshore Management Company LLC.

## MEMORANDUM DECISION AND ORDER

ALLAN L. GROPPER, Bankruptcy Judge.

These cases involve some—but not all—of the parties who traded, in the "when-issued" market, the new common stock to be issued by NTL, Inc. and its affiliates in connection with their Second Amended Plan of Reorganization. Subsequent to confirmation of the Plan, but prior to the issuance of the stock, the Debtors reduced by three-fourths, from 200 million to 50 million, the number of shares of new common stock to be issued to creditors pursuant to the Plan. This reduction in the number of shares was approved as a modification that was not intended to have a material effect on any rights under the Plan. But the modification did in fact have an impact on the interests of those who traded in the "when-issued" market, and it has resulted in a plethora of litigation on

the issue, among others, whether the change is sufficient to justify cancellation or reformation of the contracts, or some other form of relief.

As will be seen below, the key question at this point is which court should hear the cases. For the reasons stated below, this Court is convinced that centering all proceedings in a single forum is in the best interest of all parties and that issues of State law predominate and should, under the circumstances, be decided by the State court. It therefore remands the one removed lawsuit (Adv.Proc. 03–8156) and, to the extent it has other cases pending before it in which a motion to abstain has been filed, abstains in favor of the Supreme Court of the State of New York.

## FACTS

On September 5, 2002, NTL, Inc. and its affiliates (the "Debtors") confirmed their Second Amended Plan of Reorganization (the "Plan"). One of the principal terms of the Plan was the conversion of debt into 200 million shares of new common stock of NTL (the "New Stock") to be issued to creditors on the Distribution Date. The overwhelming majority of impaired creditors accepted the Plan. The Plan was to become effective once certain conditions had been satisfied, which included the execution and delivery of all documents necessary to effectuate the issuance of the New Stock.

### The November 20 Order

On November 12, 2002, prior to the effective date, the Debtors filed a motion to modify the confirmed plan pursuant to § 1127(b) of the Bankruptcy Code.[1]

---

1. Section 1127(b) provides: "The proponent of a plan or the reorganized debtor may modify such plan at any time after confirmation of such plan and before substantial consummation of such plan, but may not modify such plan so that such plan as modified fails to

meet the requirements of sections 1122 and 1123 of this title. Such plan as modified under the subsection becomes the plan only if circumstances warrant such modification and the court, after notice and a hearing, confirms

Among other things the Debtors sought discretionary authority to reduce the number of shares of New Stock from 200 million to 50 million, essentially a 1:4 reverse stock split. The Debtors alleged that they needed this modification so that they would be more clearly in a position to comply with the Plan requirement that NTL's stock be listed on a securities exchange. The initial listing requirements of the National Association of Securities Dealers' Automated Quotation System ("NASDAQ") provide that newly issued shares, such as the New Stock, must have a minimum closing bid price of at least $5.00 per share on the first day of trading. In their motion, the Debtors represented that they were concerned that the current trading price would be below the $5.00 per share minimum based on trading prices on the "when-issued" market.

In the motion, the Debtors further stated that the modification "[s]hould have the same effect as an ordinary reverse stock split, whereby the number of shares are reduced, but the relative value of all remaining shares would be expected to reflect such adjustment." (November 12 Motion, ¶ 12.) Furthermore, the modification was "[n]ot expected to have any effect on the relative value of the distributions made under the Plan to parties-in-interest" but was simply "[i]ntended to place New NTL in a better position to comply with the Plan requirement that the shares of New NTL Common Stock be listed on NASDAQ." (November 12 Motion, ¶ 13.) On the basis of the Debtors' representations, and there being no objection, the Court approved the motion on November 20, 2002 (the "November 20 Order").

It does not appear that any of the creditors who later filed adversary proceedings in this Court on February 5, 2003 were on the Debtors' list of entities to receive formal notice of the motion. The Debtors asserted that limited notice (and a brief notice period pursuant to the Court's "notice of presentment" procedures) was appropriate in view of the "non-material" nature of the relief requested. Nevertheless, the motion was filed on the Court's electronic case filing system, was available to all interested parties via the internet, and under the Court's procedures, all parties who had filed a notice of appearance received electronic notification of the filing.

On December 30, 2002, in a Form 8–K, NTL announced that it would implement the relief that had been authorized but not mandated under the November 20 Order and issue 50 million rather than 200 million shares of New Stock to its creditors. On January 10, 2003, NTL filed an Amended Plan of Reorganization which became effective that day and implemented the November 20 Order, reducing by three-fourths the number of shares of New Stock issued to creditors. Public trading of the New Stock was to commence on the next trading day, January 13, 2003.

Notwithstanding that the New Stock had not yet been issued, a market had earlier developed in the trading of the New Stock on a "when-issued" basis in anticipation of its eventual issuance. "When-issued" trading refers to the purchase or sale of a security prior to its actual issuance, when buyers and sellers enter into arrangements for the purchase and sale of the New Stock when it is eventually issued. Some or all of the post-confirmation, pre-distribution date trades on the "when-issued" market were apparently scheduled to settle on January 16, 2003—three days following the initial day of trading.

As January 16 neared, the implications of the reduction of the number of new

such plan as modified, under section 1129 of this title."

shares from 200 million to 50 million became clear and can be illustrated by the following example. Assume a creditor calculated it would receive 1000 shares of New Stock under the Plan as initially confirmed and agreed to sell these shares "when-issued" for $5 per share. The seller would have been obligated to deliver 1000 shares to receive a $5,000 purchase price. Under the Plan as amended, the creditor/seller would receive only 250 shares but under its sale agreement would apparently be still obligated to deliver 1000 shares in order to receive the purchase price of $5 per share. It appears that the documentation of a purchase or sale in the "when-issued" market typically contains no "general terms" or "boilerplate" that would bear on the matter. In order to deliver in accordance with the strict terms of the sale agreement, the seller might have to cover in the market by purchasing 750 shares (or possibly pay the buyer the difference). From the perspective of this seller, the result was disastrous—not only would it have to cover by purchasing 750 shares, but the per share price would presumably be four times the price previously anticipated since the Debtors had actually issued only one-fourth the number of shares in the reorganization. Not surprisingly, sellers sought to settle on an "adjusted basis" by delivering one-fourth the number of shares previously agreed at an "adjusted price" of four times the previous price. It is equally unsurprising that buyers, on the other hand, were inclined to insist on upholding the original contract terms.

One or more entities that had sold a significant amount of stock in the "when-issued" market apparently took the matter to the Financial Responsibility Committee of the National Association of Securities Dealers ("NASD"). The NASD's authority derives from § 2 of the Securities and Exchange Act of 1934, 15 U.S.C. § 78(b), which gives the NASD authority to regulate the over-the-counter securities market. To deal with settlement disputes that occur between members, the NASD has adopted a Uniform Practice Code, and under Rule 11130, the Financial Responsibility Committee can decide whether a trade should be cancelled. According to counsel for the NASD who appeared before the Court, the Committee can cancel or decline to cancel "when-issued" trades but cannot reform the contracts. Moreover, trades will be cancelled only if the securities to be issued are not substantially the same as those contemplated in the contracts. On January 14, 2003, the NASD Committee declined to cancel the trades.

### The January 15 Emergency Hearing

Thereupon, on January 15, 2003, the day before the "when-issued" trades were to close, a group of sellers, including Maxcor Financial Inc., Owl Creek Asset Management, L.P., JMB Capital Partners, L.P., Highbridge/Zwirn Capital Management, LLC and Salomon Brothers Holding Company, Inc., brought an emergency motion before this Court seeking a temporary restraining order that would, among other things, "clarify" the November 20 Order by modifying the terms of the "when-issued" trades and permitting them to close on an "adjusted" basis. A hearing was held on the emergency motion the same day.

At the hearing, parties on both sides of transactions, and in some cases neutral or "flat" parties, appeared and advised the Court of their respective positions. The sellers asserted that they would be irreparably injured if they were forced to comply with contractual terms different from those initially incorporated in the Plan; buyers generally relied on the sanctity of contract and the refusal of the NASD to cancel the trades. None of the parties

present was able to provide an indication as to the number of entities involved in the trading, although it was believed that the number of total shares that had traded was about 3.8 million. The Court also heard from the general counsel of the National Securities Clearing Corporation ("NSCC"), the clearinghouse for transactions in the "when-issued" market, and was advised that due to the operation of the settlement system, it was not possible to adjust transactions that were scheduled to settle on the following day. The NSCC further stated that it was neutral as to the relief sought by the movants, but it urged the Court not to interfere with the normal settlement process for trades that would close on an exchange. The Debtors and the Creditors Committee both took the position that it was appropriate to grant some relief under the circumstances in view of the equities. Their principal concern, as expressed at the hearing, was that the Debtors not be forced to rescind the Plan Amendments that had been approved in the November 20 Order. Trading in the New Stock had already commenced, and even the possibility of a change in the number of shares would create turmoil in the market that would adversely impact the value of the New Stock and harm all creditors.

### The January 16 Order

The Court held, first, that it had jurisdiction to grant relief requested but rejected the position of the movants that it should, even on a temporary basis, grant them a general right to close on an adjusted basis. It noted, among other things, that the equities might be different for those who had traded on different dates between Plan confirmation in September 2002 and the distribution date for the New Stock. As to the grant of limited relief on a temporary basis, however, the Court found that the movants had shown that the balance of the hardships weighed decidedly in their favor and that the matter was a fair ground for litigation, and that they were entitled to some protection. The relief fashioned on an interim basis in the Order entered (the "January 16 Order") provided that the trades scheduled to settle on an exchange would close but that a safe harbor would be created to allow other parties to close immediately on an adjusted basis, and thereafter seek reformation of the contracts or any other relief that might be available, subject to the right of all parties to contend that the original contract terms were binding. The January 16 Order provided:

> "ORDERED that pending the hearing and determination of the Motion, based on the Reorganized Debtors' election to implement a one for four reverse stock split on or about December 30, 2002, as reflected in the modified Second Amended Plan filed on January 10, 2003 (the 'Modified Plan'), any given seller of New NTL Common Stock (as defined in the Plan) on the 'when-issued' market (each trade hereinafter a 'Transaction') may, in its discretion, settle the Transaction to which it is a party, and the buyer in that Transaction is required to accept such settlement, on the basis that would exist if such trades were amended and modified by (i) reducing the number of shares traded in each such Transaction to 25% of the number of shares originally traded in such Transaction, and (ii) by increasing the new per share price to 400% of the per share price of the original Transaction so that the total consideration in the Transaction remains the same; and it is further

> ORDERED, that from and after the date and time that this Order is entered, all parties to Transactions to be settled in accordance with the preceding paragraph, and broker-dealers and custodians (other than registered clearing

agencies and OMGEO) clearing and settling Transactions, shall enter appropriate instructions to the appropriate entity, including but not limited to clearing broker-dealers or custodians or others, and make all appropriate entries in their books and records and take all other actions reasonably necessary to enter additional transactions that will offset deliveries made in respect of such Transactions in excess of those necessary to effectuate the intended settlement, provided that all affected entities shall reserve any and all rights to object thereto at the Hearing and seek damages or other relief in connection therewith, further provided, and notwithstanding anything in this or the preceding paragraph, as between National Securities Clearing Corporation ("NSCC") and its members, all transactions due to settle on January 16, 2003 and thereafter, shall proceed in accordance with the rules and procedures of NSCC, and all entities that settle on that basis may also appear at the Hearing, be heard and seek damages or other relief. . . . " (January 16 Order, pp. 2–3.)

The Court also scheduled a hearing for January 28, 2003 on the preliminary injunction sought by movants.

### The January 28 Hearing and January 29 Order

At the January 28, 2003 hearing, the movants sought to implement on a permanent basis the relief authorized by the January 16 Order. The Court was advised that some trades had settled pursuant to the January 16 Order, some had settled on an adjusted basis and some had not settled at all. It became clear that scores of parties were involved, and that in the absence of extensive evidentiary hearings, it would be virtually impossible for the Court to determine the propriety of relief in an individual case, as it appeared that each trade had a different set of circumstances based on the parties involved and the date of the trade. On the other hand, based on the temporary restraining order, the movants had obtained some interim relief.

In light of the foregoing, an order was entered that permitted the interim relief provided for in the January 16 Order to expire while giving each individual entity the opportunity to seek specific relief as appropriate. The Order (the "January 29 Order") therefore provided that the safe harbor created by the January 16 Order would expire on February 5, 2003, at 5:00 p.m., and that the January 16 Order and the January 29 Order were "without prejudice to the rights of any party to any When–Issued Trade to seek any form of relief, including equitable relief or money damages in any court, tribunal, arbitration or other forum of competent jurisdiction. . . . " (January 29 Order, ¶ 5.)

### The Pending Proceedings

Acting pursuant to the January 29 Order, on February 5, 2003, five parties commenced adversary proceedings in this Court as follows (collectively the "February 5 Adversary Proceedings"):

1.  03–8019: *JMB Capital Partners, L.P. ("JMB") v. CRT Capital Group LLC ("CRT")*

2.  03–8020: *Langley Partners, LP ("Langley") v. CRT Capital Group LLC, Knight Securities LP & RTX Securities Corporation*

3.  03–8021: *Highbridge/Zwirn Capital Management, LLC ("Highbridge") v. CRT Capital Group LLC & Maxcor Financial Inc. ("Maxcor")*

4.  03–8022: *Owl Creek Asset Management, L.P. ("Owl Creek") v. CRT Capital Group LLC*

5. 03–8023: *St. Albans Partners, LTD.* *("St. Albans") v. CRT Capital Group LLC* [2]

Each of these proceedings was commenced by sellers of the New Stock who sought a declaratory judgment that trades be adjusted to reflect the reverse stock split and for reformation of the "when-issued" trades. The defendants were buyers and included, as parties to many of the trades, CRT and Maxcor. CRT and Maxcor have represented that they were both buyers and sellers of the New Stock and that they are interested in seeking a universal resolution of these proceedings.

In addition, two cases were commenced in State court. On February 6, 2003, Maxcor filed a complaint in the Supreme Court of New York, County of New York (the "Maxcor Case") against P. Schoenfeld Asset Management, LLC ("PSAM"), CRT and sixteen other counterparties. On March 6, 2003 CRT filed a complaint in the Supreme Court of New York, County of New York (the "CRT Case") against thirty-five counterparties. On April 3, 2003, PSAM made a motion in the CRT Case for an order staying the action against it and compelling arbitration.[3] A few days later, two defendants in the CRT Case, JMB and Owl Creek, removed the case to the U.S. District Court pursuant to 28 U.S.C. § 1452; the case was then referred to this Court on April 30, 2003 pursuant to Standing Order M 10–468 of the United States District Court for the Southern District of New York. That case is adversary proceeding 03–8156: *CRT v. PSAM, et al.*

In many of the above-described adversary proceedings third-party complaints, cross-claims and counterclaims have been asserted in which parties who purchased or sold the New Stock have brought in their respective counterparties.[4]

### The Pending Motions

As a defendant in all of the February 5 Adversary Proceedings, CRT filed a Motion to Stay, or in the Alternative, For Abstention in Deference to State Court Action (the "CRT Abstention Motion"). CRT contends that, as a buyer and a seller, it is neutral as to the substantive result in the cases, but that it is critical that all parties be brought into one case and be bound by the same result. Maxcor joined the motion to the extent that it sought a

---

**2.** St. Albans and CRT have entered into two stipulations, both of which stay the Adversary Proceedings as to CRT, St. Albans and Camden Asset Management (d/b/a St. Albans) pending a final determination by a trial court of competent jurisdiction, a final resolution by arbitration, or a settlement as a result of mediation of the propriety of "adjusting" the trades.

**3.** PSAM argues that under the NASD Code of Arbitration Procedure, it is entitled to arbitration of this dispute because "membership in the NASD constitutes a valid and enforceable agreement to arbitrate in accordance with the NASD's arbitration rules." (Memo in Support of PSAM to Remand the CRT Action or, Alternatively, to Stay and Compel Arbitration, p. 9.) It asserts that Rules 10101 (disputes that may be arbitrated) & 10201 (disputes that must be arbitrated) of the NASD Code

apply here because CRT failed to honor its obligation to settle and deliver the shares of the New Stock it had contracted to sell to PSAM.

**4.** There is also an additional adversary proceeding, 03–2126: brought by Instinet Corp. ("Instinet") against Susquehanna Capital Group ("Susquehanna"), Jefferies & Company, Inc., Halcyon/Alan B. Slifka Management Company LLC, Halcyon Management Company LLC and Halcyon Offshore Management Company LLC. In this proceeding, Susquehanna also filed a third-party complaint against three third-party defendants to whom it sold New Stock: (i) Vandham Securities Corp., ("Vandham") (ii) Knight and (iii) TD Waterhouse Capital Markets; and third-party defendant Vandham filed a fourth-party complaint against four defendants. No motions have been filed in this case to date.

discretionary stay or abstention. Opposition to CRT's Abstention Motion was filed by JMB and joined by Owl Creek, Langley, Highbridge and St. Albans. A hearing was held on April 21, 2003, and the matter was taken under advisement. Following the hearing, JMB and Owl Creek filed amended complaints in their respective adversary proceedings (03–8019 & 03–8022) asserting claims against NTL Europe, the successor to the Debtors. The claims seek conditional relief against the Debtors in the event JMB and Owl Creek are required to settle "when-issued" trades on an unadjusted basis, on the ground that the Debtors were aware that creditors, to whom they owed a fiduciary duty, were participating in the "when-issued" market for the New Stock and that the proposed modification reducing the number of shares issued lacked a mechanism to ensure that such creditors were not harmed.

After removal, CRT and PSAM separately filed motions to remand the CRT Case to the Supreme Court of New York. PSAM also requested, in the alternative, that the Court stay the action and compel arbitration. A hearing on the motions to remand was held on June 12, 2003 (the "June 12 Hearing"), and the Court advised it would issue a decision shortly on both the abstention and remand motions but deemed it necessary first to give the parties an opportunity to be heard on the motion by JMB and Owl Creek to add NTL Europe as a third-party defendant. The proposed third-party complaint made essentially the same claims of gross negligence and breach of fiduciary duty against the Debtors that JMB and Owl Creek had made in the amended complaints filed against the Debtors in their respective adversary proceedings.

A hearing was scheduled on June 17, 2003 to consider the motion by JMB and Owl Creek to file the third-party complaint against the Debtors. The Debtors had not filed any opposition. The Court stated that it was convinced that the removed case should be remanded to the State court and that the Bankruptcy Court should exercise its discretion, pursuant to 28 U.S.C. § 1334(c)(1), to abstain from hearing the adversary proceedings in which abstention motions had been brought. It further stated that it would issue a written decision shortly, but that it would also give the Debtors, JMB, Owl Creek and any other interested party the opportunity to brief the issue whether the Court should sever and possibly retain jurisdiction over the claims against the Debtors. Rather than brief this issue, on June 20, 2003, JMB and Owl Creek withdrew, without prejudice, their motion to file a third-party complaint against the Debtors. Faced with the Court's oral decision to abstain in the adversary proceedings they had commenced, they also filed, pursuant to Bankruptcy Rule 7041(a), incorporating F.R.Civ.P. 41(a), notices of dismissal, without prejudice, of both adversary proceedings.

In light of these developments, the following motions remain pending: (i) CRT's Motion to Abstain, but only as to *Langley v. CRT* (03–8020) and *Highbridge v. CRT* (03–8021); and (ii) CRT's and PSAM's Motions to Remand. The Debtors are not at this point a party to any of the pending lawsuits.

### DISCUSSION

#### The Motions to Abstain

■ 28 U.S.C. § 1334, which provides for general Federal jurisdiction of "all cases under title 11" and "all civil proceedings arising under title 11, or arising in or related to cases under title 11," also gives the district court (and by referral, the bankruptcy court) broad power to abstain. 28 U.S.C. § 1334(c)(1) provides:

Nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11.

Whether to abstain in a bankruptcy proceeding is a matter left to discretion of the court. *Luan Inv. S.E. v. Franklin 145 Corp. (In re Petrie Retail, Inc.)*, 304 F.3d 223, 232 (2d Cir.2002).

■ As this Court has stated, "The key factors for discretionary abstention under 28 U.S.C. § 1334(c)(1) implicate: (1) the interest of justice; (2) the interest of comity with state courts; or (3) respect for state law." *Kolinsky v. Russ (In re Kolinsky)*, 100 B.R. 695, 705 (Bankr.S.D.N.Y. 1989). Here, each of these factors militates in favor of abstention.

■ In the interest of justice, all parties to the trades in the "when-issued" market should, to the greatest extent possible, have their claims and the claims of all of their counterparties heard in one forum and be subject to one consistent determination. In these cases, there is not only the identity or at least similarity of issues, but it would be unjust for a party who bought from one entity and sold to another not to have all of the trades subject to the determination of one court. It is recognized that PSAM has moved, in both this Court and in the Maxcor Case, for an order requiring NASD arbitration, and that in the Maxcor Case Justice Ramos of the New York Supreme Court directed that these claims be arbitrated. It may be that all of the claims cannot be determined in one forum and that some of the matters may be arbitrated.[5] But the fact that some of the claims may be subject to arbitration does not, under the circumstances of this matter, justify splitting the remaining claims between the State and Federal judicial systems.

Under the circumstances here, it would also not be in the interest of justice to retain the matter in the bankruptcy court rather than a court of general jurisdiction that can determine the real issues at less cost and with more assurance of finality. At the time of the November hearing, the Court found that its jurisdiction emanated from the fact that it had confirmed a plan of reorganization and had a strong interest in the integrity and reliability of its orders confirming plans and in the market where securities trade in the wake of such orders. (Trans. Hearing of Jan. 15, 2003, p. 76.) In *In re Petrie Retail, Inc.*, 304 F.3d at 229–30, the Second Circuit found that a combination of factors, including the fact that a post-confirmation contract dispute among non-debtors was "based on rights established in" a bankruptcy court order and that the proceeding before the bankruptcy court sought "enforcement of a pre-existing injunction issued as part of the bankruptcy court's sale order and confirmation order", rendered the dispute subject to the bankruptcy court's core jurisdiction. At the time of the January 15 hearing and the January 16 Order creating a safe harbor for the closing of trades on that date, these same issues were paramount. The Debtors' Plan had recently become effective, trading in the New Stock had just begun and the relief granted was grounded on a request that the Court modify its November 20 Order to require the Debtors to issue the number of shares initially contemplated in the Plan, or take other action to protect those who had traded in the "when-issued" market in reliance on the Plan.

---

5. It appears that under principles of NASD arbitration, the parties to the arbitration can still request that the arbitrators stay the proceedings in favor of a court determination.

At this point, these issues have receded and modification of the Plan is not under consideration or implicated in any way. The Debtors' interest in the litigation between non-debtors as to the question of contract enforcement or reformation is much more attenuated, especially as JMB and Owl Creek have, at least for the moment, abandoned their effort to bring the Debtors into the litigation as additional defendants or as third-party defendants.[6] The issues now are fundamentally State law issues.

■ That takes us to the second and third factors in the *Kolinsky* case, the interest of comity with the State courts and respect for State law. In their opposition to the motion to abstain, JMB and Owl Creek characterized these cases as involving core bankruptcy matters, including the modification of the Debtors' Plan and the proper interpretation and implementation of the Court's November 20 Order. Because these disputes involve core bankruptcy matters, they asserted, this Court is in the best position to interpret its own orders and to resolve the issues globally. But the fact that a plan or bankruptcy court order is involved in a controversy does not mean that State law is superceded. Confirmed plans of reorganization are judgments of the Federal court, but they are construed in accordance with State law. *Hillis Motors, Inc. v. Hawaii Automobile Dealers' Ass'n,* 997 F.2d 581, 588 (9th Cir.1993); *Breeden v. Bennett (In re Bennett Funding Group, Inc.),* 220 B.R.

743, 758 (Bankr.N.D.N.Y.1997). This Court's order of November 20 is one event that gave rise to the litigation, but the real issues today do not involve the interpretation of the order, but rather its effect on the rights of parties to private contracts. Those issues are sufficiently distinct from the bankruptcy case that they can and should be decided in the State court under applicable State law. See *In re Verrazano Holding Corp.,* 86 B.R. 755, 762–64 (Bankr.E.D.N.Y.1988).

■ In determining whether to abstain as a matter of discretion pursuant to § 1334(c), several courts have also considered the following twelve factors:

(1) the effect or lack thereof on the efficient administration of the estate if a Court recommends abstention, (2) the extent to which state law issues predominate over bankruptcy issues, (3) the difficulty or unsettled natures of applicable state law, (4) the presence of a related proceeding commenced in state court or other non-bankruptcy court, (5) the jurisdictional basis, if any, other than 28 U.S.C. § 1334, (6) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case, (7) the substance rather than form of an asserted "core" proceeding, (8) the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court, (9) the burden of [the court's] docket, (10) the likelihood that the commence-

---

**6.** In view of the present status of the matter, it is irrelevant whether JMB and Owl Creek brought the Debtors into the litigation in order to bolster their contentions in favor of bankruptcy court jurisdiction. Nor is it necessary to decide whether, if the Debtors are brought into the State court cases, they could, if they desire, remove such claims pursuant to the provisions of 28 U.S.C. § 1452(a), which permit a party to remove a claim or cause of

action in a civil proceeding. The remand of the CRT case provided for below is explicitly without prejudice to the right of the Debtors, if they are brought back into any of the lawsuits, to seek to remove any claims against them, as these claims would present a very different case on issues relating to the jurisdiction of this court and the propriety of abstention.

ment of the proceeding in a bankruptcy court involves forum shopping by one of the parties, (11) the existence of a right to a jury trial, and (12) the presence in the proceeding of non-debtor parties. *In re Cody, Inc.*, 281 B.R. 182, 190–91 (S.D.N.Y.2002), citing *In re 610 W. 142 Owners Corp.*, 1999 WL 294995 (S.D.N.Y. 1999); *see also In re Craft Architectural Metals Corp.*, 115 B.R. 423, 432 (E.D.N.Y. 1989); *Republic Reader's Service, Inc. v. Magazine Service Bureau, Inc. (In re Republic Reader's Service, Inc.)*, 81 B.R. 422, 429 (Bankr.S.D.Tex.1987). A review of these factors underscores the propriety of discretionary abstention in this case. Thus, (1) there will be little impact on the efficient administration of the bankruptcy estate by virtue of the abstention, especially as the Plan has been confirmed; (2) as indicated above, State law issues predominate; (3) related proceedings have been commenced and are pending in the State court; (4) there is no Federal jurisdictional basis other than § 1334; (5) the issues in the adversary proceedings are, at this stage, remote from the bankruptcy case; (6) even if the issues are subject to the court's core jurisdiction, the jurisdictional issues, at this stage of the proceeding, are not free from doubt, and (7) the parties at

the present time are all non-debtors. In brief, this appears to be a textbook case in favor of discretionary abstention.[7]

### The Motion to Remand

■ While the motions to abstain in the adversary proceedings were pending, JMB and Owl Creek also removed to the Federal court the State court suit brought by CRT against its 35 counterparties. CRT responded with a motion to remand, asserting that this Court does not have subject matter jurisdiction because the disputes are State law contract reformation disputes and that the case should be remanded in any event for equitable reasons.[8]

■ Section 1452(a) of Title 28 of the United States Code grants a very broad right to parties to civil actions to remove "any claim or cause of action" to the district court (and, by referral, to the bankruptcy court), provided that bankruptcy jurisdiction exists under 28 U.S.C. § 1334. Section 1452(b) then provides the district court (and, by referral, the bankruptcy court) with an equally broad right to remand such claims or causes of action "on any equitable ground." Courts consider a number of factors in deciding whether to

---

7. In light of this decision, it is not necessary to determine whether this Court would have jurisdiction, whether the claims in the adversary proceedings are core or non-core and whether, if non-core, the court would have to abstain mandatorily under the provisions of 28 U.S.C. § 1334(c)(2), which "requires the district court to abstain from hearing a non-core matter which can be timely adjudicated in state court in a previously commenced action." *S.G. Phillips Constrs., Inc. v. City of Burlington (In re S.G. Phillips Constrs., Inc.)*, 45 F.3d 702, 708 (2d Cir.1995). Section § 1334(c)(2) provides: "Upon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not

have been commenced in a court of the United States absent jurisdiction under this section, the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction."

8. The CRT Remand Motion was joined by PSAM; PSAM also asked, in the alternative, for an order compelling arbitration. In light of the Court's decision to remand to the State court, the State court should decide whether to compel arbitration. Another defendant in the CRT Case, Jones & Associates, also filed a Motion to Stay and Compel Arbitration but withdrew the motion without prejudice after the Court's announcement of its decision on abstention and remand.

remand under this section. In a frequently cited formulation, equitable factors have been held to include:

> (1) the effect on the efficient administration of the bankruptcy estate; (2) the extent to which issues of state law predominate; (3) the difficulty or unsettled nature of the applicable state law; (4) comity; (5) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case; (6) the existence of the right to a jury trial; and (7) prejudice to the involuntarily removed defendants.

*Drexel Burnham Lambert Group, Inc. v. Vigilant Ins. Co.* 130 B.R. 405, 407 (S.D.N.Y.1991) (citation omitted). Courts also consider two additional factors: "the duplicative and uneconomical use of judicial resources" and the "lessened possibility of inconsistent results." *Phoenix Elec. Contracting, Inc. v. Lovece,* 1993 WL 512917, *3 (S.D.N.Y.1993); *see also Nemsa Establishment, S.A. v. Viral Testing Systems Corp.,* 1995 WL 489711, *7 (S.D.N.Y. 1995). These factors, however, are merely illustrative, and the Court may remand on *any* equitable ground. *Lone Star Industries v. Liberty Mutual Ins.,* 131 B.R. 269, 274 (D.Del.1991) (debtor's breach of contract action remanded where action dealt solely with State contract law); *In re Micro Design, Inc.,* 120 B.R. 363, 366 (E.D.Pa.1990) (noting the broad discretion given to the court when considering whether to remand a removed proceeding).

The same factors that militate in favor of discretionary abstention weigh heavily in favor of remand, for similar reasons. Considering the factors in the *Drexel Burnham* formulation, there should be little adverse affect from remand on the "efficient administration of the bankruptcy estate"; at this point, the case has been administered. State law issues predominate, and at present, the issues in the CRT proceeding are relatively remote to the issues in the bankruptcy case. It would be uneconomical to litigate the CRT disputes in a Federal forum and the Maxcor Case in the State court, as well as to permit the resolution of the cases to be delayed by the need to consider issues relating to bankruptcy court jurisdiction. Even though certain of the disputes may be subject to arbitration, centering the litigation in the State court will at least reduce the possibility of inconsistent results, an especially important factor here, where some of the parties are both buyers and sellers and purport to seek only certainty and one rule governing all of the trades. See *In re Baltic Associates, L.P.,* 149 B.R. 93 (Bankr.E.D.Pa.1993).

In *Bayside Fuel Oil Corp. v. Savino (In re Savino Oil & Heating Co.),* 1992 WL 118801, 1992 U.S.Dist. LEXIS 7703 (E.D.N.Y.1992), the court remanded an action to the State court despite the fact that jurisdiction existed under 28 U.S.C. § 1334 and issues in the removed action involved the effect of a prior bankruptcy court consent order. The court held that "the prior orders of the bankruptcy court are relevant principally as they aid in the resolution of various state law issues" and that the proceeding should be remanded on equitable grounds in view of the predominance of the State issues and the remoteness of the dispute to the bankruptcy case. See also *In re Riverside Nursing Home,* 144 B.R. 951, 956 (S.D.N.Y.1992); *Western Helicopters, Inc. v. Hiller Aviation, Inc.,* 97 B.R. 1, 6 (E.D.Cal.1988). Similarly here, even if bankruptcy jurisdiction exists at this stage of disputes among the parties who traded securities of the Debtors in the "when-issued" market, the real issue is the proper settlement basis of trades among non-debtor contracting parties. Under all of the circumstances, it is equitable for these claims to be centered in consolidated proceedings in one court.

*CONCLUSION*

The CRT Case is remanded to the Supreme Court of the State of New York, County of New York. This Court abstains in the *Langley* and *Highbridge* cases. The pending motions to require arbitration are denied without prejudice to renewal before the State court. The St. Albans adversary proceeding shall remain stayed in accordance with the stipulation entered therein.

IT IS SO ORDERED.